(No. 21117.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHRIST STROOK, Plaintiff in Error.

*Opinion filed February 19, 1932.*

EMMETT I. HARRINGTON, (EUGENE L. McGARRY, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Christ Strook, (herein called the defendant,) was indicted for burglary by the grand jury of Cook county in December, 1927. He was tried and convicted by a jury in the criminal court of Cook county on April 30, 1929, and was sentenced to the penitentiary at Joliet. He has sued out this writ of error for a review of the judgment.

The indictment is in two counts. The first count charged the defendant with feloniously, burglariously, willfully, maliciously and forcibly breaking and entering the dwelling house of Francis Mead, in Cook county, Illinois; and the second count charged the defendant with entering said dwelling house feloniously, burglariously, willfully, maliciously and without force, the doors and windows being open, with intent the personal goods, chattels, money and property of Mead to steal, take and carry away.

The material facts stated by the defendant and by the People, and in substantially the same language as used by them and as disclosed by the abstract of the record, are in

substance the following: Francis Mead and his sister, Cecelia Mead, resided at 7956 South Chicago avenue in an up-stairs apartment and conducted a business on the lower floor of the premises in April, 1927, on which floor was what they called a "wheel steel tape factory." On April 17, 1927, they left their home and did not return until about 10:30 P. M. of that date and after they had been notified by telephone by a man at their home that their house had been "ransacked." When they returned home they found their apartment in confusion, bureau drawers pulled out and contents spilled on the floor and mattresses overturned and carpets and rugs turned up. Miss Mead saw the defendant at the police station in South Chicago on April 18, 1927, and asked him how he came to pick out her brother's place to enter. He replied to her, "I don't know; I just did." She further testified that he told her the window was not locked and that he knew how to manage the high-powered wires that came over the roof of the building.

Officer William J. Loftus, of the detective bureau squad 8-B, testified that he and his partner, Martin Connolly, went to 7956 South Chicago avenue about 9:30 P. M. in response to a call he got from that number, and when they got there the hall door was open. He went up-stairs, while his partner, Connolly, went around to the back of the premises. The contents of some of the drawers of the bureau were dumped out on the floor and the carpets were torn up. He looked through the glass of the door leading out onto the roof and saw the defendant on the roof. He was able to identify the man on the roof as the defendant by reason of a big arc light on the street corner and the lights in the bed-room, which he had turned on and which were shining on the roof. The defendant started to run to the corner of the roof and witness called on him to stop, or halt. He fired a shot in the air, and the defendant slid down the telegraph pole that was near the corner of the roof. Witness then went down-stairs and around to the back

of the building, where his partner, Connolly, had the defendant. They searched him and found on him what they called a "jimmy" but what the defendant said was a box-opener.

Officer Martin Connolly testified that he first saw the defendant coming down the telegraph pole in the alley at the rear of 7956 South Chicago avenue and about two feet from the building; that he heard a couple of shots fired and then saw the defendant coming down the telegraph pole; that just as he got to the ground witness grabbed him and searched him for a gun but did not find any but found an implement called a "jimmy," which is used by merchants and others for opening boxes and crates; that it was not a burglar's jimmy but it may be also used for opening doors and windows; that the defendant did not try to run away when he slid to the ground, because he did not have a chance to do so, as witness grabbed him and held him; that the defendant told him that he went into the alley to urinate; that his friend who was with him had his car over at the filling station near the premises getting some gasoline, and that "we went over to the filling station" and the defendant said, "I guess my friend has gone away and left me." Connolly further testified that they searched the defendant and found on him some keys, a pocket knife and a few dollars and some change in his pockets, and that he had some bills which he said were for goods that he had bought from the commission houses.

The defendant testified in his own behalf that he was sixty-eight years old and had been in the commission business for the past forty years, buying and selling goods and merchandise from warehouses and cold storage; that on the day in question he went out to Gary to meet a man named Miller, who wanted him to buy a quantity of black walnuts and butternuts; that on their way home they stopped at a filling station to get some gas and oil; that he stepped into an alley at the corner "to take a leak," when he heard a couple of shots fired and saw a man coming down a tele-

graph pole and run away down the alley, and that a police officer grabbed witness and asked him how he happened to try to make a place like that. He told the officers how he happened to be in that neighborhood, and they said it was a lot of "bologna." He further testified in answer to questions by his own counsel that he was convicted of burglary in 1894 and served his time and paid his debt to society and since that time had been engaged in lawful business. He denied the charge that he entered said premises. He also denied the statement of the officers that he was on the roof of the building at 7956 South Chicago avenue. He said that he had tried to get in touch with Miller, his friend, who was at the gasoline station, to get him to come and testify for him, but that he found out that Miller had gone to California or to the "old country."

John Chambers, a commission merchant, testified that he knew the defendant and had known him for about twenty-five years in business, and that his reputation for being a law-abiding citizen in that community where he resided was good. He also testified that he knew that the defendant lived somewhere "up on the North Side." Francis Mead testified that he saw the defendant at the South Chicago police station after he was arrested. Martin Connolly further testified that he was a police officer assigned to the detective bureau squad 8-B, and he and officer Loftus testified that defendant was taken to the station. The defendant also testified that he lived at 841 Lafayette parkway with his wife and daughter, and that he asked his daughter to drive him out to Gary to meet Miller on Sunday evening of April 17, 1927. His daughter testified that she drove him from his home to Gary on Sunday, April 17, 1927, to meet his friend Miller and that when they got to Gary her father got into a car with Miller. Miller had called her up on that day and asked for her father. He said he wanted her father to meet him in Gary at six o'clock that evening as he had a load of nuts that

he wanted him to buy, and she replied that she would tell her father what he wanted him to know.

The errors relied on by the defendant for a reversal of the judgment are: (1) The verdict is against the weight of the evidence and is the result of passion and prejudice; (2) the venue was not proved as laid; and (3) the *corpus delicti* was not sufficiently established.

The jury was warranted in finding that the crime of burglary was committed by the defendant at the premises described as 7956 South Chicago avenue about 9:30 P. M. on Sunday, April 17, 1927, and that the proof established that charge beyond a reasonable doubt. It was necessary, in order to sustain the conviction, that the proof show, beyond a reasonable doubt, that the offense was committed in the county of Cook and State of Illinois. The proof in this record does not show, beyond a reasonable doubt, that the offense was committed in the State of Illinois or in the county of Cook or in Chicago. The venue of an offense may be proved like any other fact in a criminal case. It is not necessary that the venue be established by witnesses who use the very words of the information or of the indictment. It is sufficient if the facts appearing in evidence lead with certainty to the conclusion that the offense was committed in the county and State as alleged. (*Weinberg* v. *People,* 208 Ill. 15.) This court has held that it cannot take judicial notice that certain streets are located in Chicago or anywhere else in Cook county, Illinois. (*Dougherty* v. *People,* 118 Ill. 160; *Gunning* v. *People,* 189 id. 165; *People* v. *O'Gara,* 271 id. 138.) In *Moore* v. *People,* 150 Ill. 405, we held that the charge in the indictment that the crime of rape was committed in Madison county, Illinois, could not be sustained by proof that it was committed in Upper Alton, without a showing in the record in what county or State Upper Alton is situated. The reasons for the holdings in the foregoing cases are clearly based on the facts that streets of the same name

as certain streets of any city of Illinois may be found to also exist in other cities of Illinois or in cities of other States of this country, and that cities or towns of the same name as Upper Alton or other towns or cities in Illinois may be found to also exist in other States of this country. All the members of this court may know, and no doubt do know, and it may be known by every citizen in Chicago and by many other citizens in Illinois, that a citizen of Chicago who lives in the north part of Chicago is often referred to by the citizens of said city as one residing "upon the North Side," and that citizens living in the west and south portions of Chicago are similarly referred to as citizens living "on the West Side," or "on the South Side." For the foregoing reason we cannot take judicial notice of the fact that the defendant lives in the city of Chicago by reason of the fact, alone, that it was proved in the record that he lived "upon the North Side." We cannot take judicial notice of the fact that the defendant committed the crime charged in the county of Cook and State of Illinois by reason of the facts proved in the record that he was arrested by police officers William J. Loftus and Martin Connolly, assigned to the detective bureau squad 8-B, and was imprisoned, as testified by Connolly, in "the station," or by reason of the further fact that Francis Mead and Cecelia Mead testified that they saw the defendant "at the police station in South Chicago on April 18, 1927." It often happens that a defendant is arrested and imprisoned in one town or city or county for a crime committed in another town or city or county.

The *corpus delicti* was proved. Technically speaking, the *corpus delicti* is the body of the crime or the essence of the crime. (Bouvier's Law Dict. p. 407.) To establish or prove the *corpus delicti* it is not necessary to prove that the crime charged was committed in the county and State of Illinois, as charged in the indictment. The *corpus*

*delicti* in this case is simply the charge that the premises of Francis Mead were burglarized by the defendant.

For the sole reason that all the facts proved in the record were insufficient to establish the venue—that is, to prove that the offense was committed in the county of Cook and State of Illinois—the judgment of the criminal court of Cook county is reversed and the cause is remanded.

*Reversed and remanded.*